AO 91 (Rev. 11/11) Criminal Complaint

**LODGED**
CLERK, U.S. DISTRICT COURT
5/19/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: TV DEPTUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
5/19/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: clee DEPUTY

United States of America
v.
Vardges Abelyan

Case No. 2:23-mj-02601

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __June 23, 2020,__ in the county of __Los Angeles__ in the __Central__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |

This criminal complaint is based on these facts:

See Attached Affidavit

☐ Continued on the attached sheet.

/s/
*Complainant's signature*

Justin Palmerton, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: May 19, 2023

*Judge's signature*

City and state: Los Angeles, CA

Steve Kim, U.S. Magistrate Judge
*Printed name and title*

AUSA: Alexander Schwab x1259

# AFFIDAVIT

I, Justin Palmerton, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1.  I am a Special Agent with the Federal Bureau of Investigation and have been so employed since January 2018. I am currently assigned to a Los Angeles Field Division White Collar Crimes Squad, which is responsible for investigating complex financial crimes. Prior to being employed by the FBI as a Special Agent, I was employed as a Certified Public Accountant at a public accounting firm. My roles and responsibilities included financial statement audits, tax return preparation and accounting consulting work.

2.  Since becoming an FBI Special Agent in 2018, I have received 21 weeks of formal training at the FBI Training Academy in Quantico, Virginia. During the time I have been employed by the FBI, I have participated in investigations relating to wire fraud, mail fraud, and various types of complex financial crimes. I have participated in many aspects of criminal investigations, including reviewing evidence, analyzing financial documents, conducting physical and electronic surveillance, working with informants, and executing search and arrest warrants.

## II. PURPOSE OF AFFIDAVIT

3.  This affidavit is made in support of a criminal complaint against VARDGES ABELYAN for wire fraud, in violation of 18 U.S.C. § 1343, and an application for a warrant to search property seized from ABELYAN at the time of his arrest (the "Subject Property") for evidence of violations of 18 U.S.C. §§ 1343, 1344, 1014, 1028A, and 1956 (the "Subject Offenses").

4.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or

investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. PROPERTY TO BE SEARCHED

5.  The Subject Property comprises digital devices, personal effects, and baggage seized from ABELYAN in the course of his arrest on May 18, 2023.

### IV. STATEMENT OF PROBABLE CAUSE

6.  My investigation has revealed that VARDGES ABELYAN fraudulently obtained $159,900 in COVID relief funds from the United States Small Business Administration ("SBA") in connection with a shell company he created and that he falsely claimed did substantial business and employed dozens of people. In connection with the purchase of a condominium in North Hollywood, he also submitted various false information to his mortgage lender, including falsified bank statements, and a letter with the forged signature of his accountant.

7.  I have previously served ABELYAN with process directed to Cargo Fleet Rentals and he subsequently retained counsel. He is therefore aware that Cargo Fleet Rentals is involved in a federal criminal investigation. ABELYAN's attorney was explicitly notified on May 16 that ABELYAN is currently viewed as an investigative target. Despite this fact, he attempted to depart Los Angeles International Airport on May 18 on a flight to Armenia by way of Doha, Qatar.

8.  According to government databases, ABELYAN is an Armenian citizen living as a legal permanent resident in the United States. My understanding is that offenses, like the ones ABELYAN committed here, that "involve[] fraud or deceit in which the loss to the victim or victims exceeds $10,000" constitute aggravated felonies for immigration purposes. 8 U.S.C. § 1101(a)(43)(M)(i). A conviction on such an offense would subject ABELYAN, who is not a citizen of the United States, to automatic deportation, and I believe his efforts to depart the United States for Armenia are consistent with an effort to flee the country to avoid prosecution.

A.  **Background on the EIDL Program**

9.  Based on my review of SBA documents and conversations with SBA representatives, I know the following:

   a.  The Economic Injury Disaster Loan Program ("EIDL") is an SBA program that provides low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or about March 2020 that was designed to provide emergency financial assistance to Americans suffering economic harm as a result of the COVID-19 pandemic. The CARES Act authorized the SBA to provide EIDL loans of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic. To obtain an EIDL loan, a qualifying business is required to submit an application to the SBA and provide information about the business's operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDL loans for COVID-19 relief, the 12-month period was the 12-month period from January 31, 2019, to January 31, 2020.

   b.  In submitting an EIDL application, the applicant is required to certify that all of the information in the application was true and correct to the best of the applicant's knowledge. EIDL loan applications are submitted directly to the SBA and processed by the agency with support from a government contractor. The amount of the loan, if the application is approved, is determined in part based on the information provided by the applicant about employment, revenue, and cost of goods sold. Any funds issued under an EIDL loan are issued directly by the SBA. EIDL loan funds can be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.

B.  **ABELYAN Defrauds the EIDL Program**

10.  According to California Secretary of State records that I have reviewed, on July 25, 2019, VARDGES ABELYAN caused "Cargo Fleet Rentals Inc." to be incorporated in the State of California. In subsequent corporate filings, he has listed himself as chief executive

officer, chief financial officer, director (with no vacancies on the board of directors), and agent for service of process, and described the business as an "AUTO RENTAL" business. The address he used for Cargo Fleet Rentals in the corporate filings—12439 Magnolia Boulevard, Unit 401, in Valley Village—is a rented mailbox within a small storefront that rents out private mailboxes akin to post office boxes.

11. Despite the fact that Cargo Fleet Rentals was incorporated in July 2019, according to bank records I have reviewed, ABELYAN only opened a Chase business account for the company on June 18, 2020, and I am aware of no other bank accounts in the name of Cargo Fleet Rentals. On the signature card for the account, he listed himself as president and listed a business address of 5404 Whitsett Ave., Apt. 222, in Valley Village. Like the address on Magnolia Boulevard, this address also corresponds to a private mailbox within a small storefront at that location. It is not, as indicated on the signature card, an apartment.

    a. In my training and experience, I know that those engaged in fraud often use private mailboxes, post office boxes, and cheap temporary office spaces to receive correspondence connected with their schemes. Such locations help conceal the true residences of those who commit fraud, enabling them avoid creditors or law enforcement. Additionally, listing a nonresidential address for a business can be used to create a false impression of legitimacy for that business.

12. I have reviewed SBA records for an EIDL program loan ABELYAN obtained on behalf of Cargo Fleet Rentals. ABELYAN submitted his application on June 20, 2020—just two days after he opened a Chase bank account for Cargo Fleet Rentals. In the application, he listed the Magnolia Boulevard mailbox address as the business's address and the Whitsett Avenue mailbox address as his own address. ABELYAN made several false statements in applying for the loan, including the following:

    a. *First*, ABELYAN claimed his business had 32 employees, made $1,465,790 in gross revenues in 2019, and had monthly sales of $122,149.16.

i. According to IRS records, however, Cargo Fleet Rentals submitted no tax records, such as W-2s or 1099s, for the dozens that Cargo Fleet Rentals supposedly had. Nor did Cargo Fleet Rentals file a corporate return. ABELYAN's personal return for 2019, which I have reviewed, is also inconsistent with his EIDL program loan application. On his 2019 return, he listed $11,191 in income for 2019—all purportedly from Cargo Fleet Rentals, treating it as an S Corp (i.e., a pass-through entity). ABELYAN's California tax return, which included a copy of his federal return and contains the same representations concerning ABELYAN's income, is dated May 7, 2021. This date is well after he applied for the SBA loan on behalf of Cargo Fleet Rentals.

ii. Additionally, the bank statements for the Cargo Fleet Rentals account at Chase are not consistent with the operation of a legitimate business, let alone one with nearly $1.47 million in gross revenues in 2019 (despite the fact the business was only incorporated in July 2019). Most of the debits from the account consist of transfers to ABELYAN's personal Chase bank account ending -6991, bank fees, payments to the Franchise Tax Board, and payments to the SBA (presumably to service the EIDL program loan). The bank records do not reveal payments consistent with maintaining a payroll of a business with 32 employees nor other payments consistent with operating an auto rental business.

iii. On May 18, 2023, another FBI agent informed me that she checked a California Department of Motor Vehicles database for vehicles registered to either ABELYAN or Cargo Fleet Rentals. One vehicle is registered to ABELYAN: a 2023 BMW. No vehicles are registered to Cargo Fleet Rentals, which further confirms my belief that it is a shell company rather than a legitimate auto rental business.

b. **_Second_**, ABELYAN agreed to "use all the proceeds . . . solely as working capital to alleviate economic injury cause by disaster." As explained in the foregoing paragraph, the loan proceeds do not appear to have been used to finance business expenses; if anything, the bank and tax records I have reviewed suggest that Cargo Fleet Rentals is not a legitimate business at all.

13.  The SBA disbursed $159,900 through the EIDL program into ABELYAN's Chase account for Cargo Fleet Rentals. The funds were deposited in two disbursements: $10,000 on June 23, 2020, and $149,900 on June 26, 2020. I have reviewed statements for the Cargo Fleet Rentals account, and it appears these were the first financial transactions in the account after he opened it on June 18.

14.  I previously was informed by a representative of the SBA that all EIDL program loans are disbursed from Colorado, meaning that the transfer of EIDL funds into the Cargo Fleet Rentals account traveled in interstate commerce.

C. **ABELYAN Commits Loan Fraud and Aggravated Identity Theft in Connection with His Mortgage Application**

15.  About a year after committing SBA loan fraud, ABELYAN committed loan fraud and identity theft with respect to the purchase of a condominium unit located at 12720 Burbank Boulevard, Unit 118, in North Hollywood. To purchase the condo, he obtained a $336,000 loan from United Wholesale Mortgage LLC. I have reviewed multiple uniform residential loan applications included in the United Wholesale Mortgage file for ABELYAN. In one of those applications,[1] he lists the Magnolia Boulevard private mailbox location as his "current address" (at which he had purportedly resided for 4 years and 2 months) and listed his employer as "Vardges Abelyan Consulting" with a gross monthly income of $5,527.34 and six-and-a-half years "in this line of work."

16.  Also included in the loan file was a profit and loss statement for "Vardges Abelyan Consulting" claiming $6,932.86 in average monthly net income for 2021. This

---

[1] The loan file provided by United Wholesale Mortgage includes what appears to be an initial uniform residential loan application, signed and dated by defendant on August 5, 2021. It also includes multiple completed but unsigned copies of a version that, based on notes in the United Wholesale Mortgage file, appears to have been completed along with various other documents on or about August 16, 2021. The August 16 version is materially consistent with the August 5 version, though it includes additional details, such as additional bank account information.

I have reviewed many mortgage files as a fraud investigator, and in my experience, it is fairly common that employees of the lender or mortgage broker will fill out new versions of the form as new information is supplied by the borrower but without requiring a new borrower signature.

statement was accompanied by a letter from an individual with initials M.A., and who purported to be an enrolled agent (i.e., a federally authorized tax practitioner). The letter stated, "The purpose of this letter is to verify that Mr. Vardges Abelyan's consulting business has been active for 6 years and reported as schedule C income. The business is currently active and is generating profit. The business has not been affected by Covid-19." I interviewed M.A., who is a real tax preparer and enrolled agent. Though M.A. did not recognize ABELYAN's name, he verified that he was, in fact, a customer of M.A.'s tax preparation business. However, M.A. noted that the letter ABELYAN included with his loan application is a forgery, that the signature is not his, and that he always uses official letterhead and includes his enrolled agent number when signing documents of this nature. Thus, ABELYAN unlawfully used the name of M.A. in perpetrating his loan fraud against United Wholesale Mortgage.

17. ABELYAN also supplied United Wholesale Mortgage with forged bank statements that I have reviewed, along with a signed letter, dated August 9, 2021, stating, "Please note the circled deposits on my Chase bank account ending in 5832 bank statements [sic] are business related deposits. This account is being used for my consulting business." The purported statements ABELYAN provided from a Chase bank account ending -5832 were for the periods between April 21, 2021, through July 21, 2021. Consistent with the letter, these statements listed regular deposits between $2,500 and $3,000 that were circled.

    a. These documents are forgeries. From my review of bank records, I know ABELYAN had not yet opened his account ending -5832 for the timeframe of the statements he provided United Wholesale Mortgage. Instead, ABELYAN opened his bank account ending -5832 at Chase on August 8, 2021—the day before his letter. The first transaction in the account was an $80,000 transfer from his checking account ending -6991 on August 13, 2021. That same day, he transferred $76,831.91 to Central Escrow LA, which I know from records I have reviewed to be the escrow company that facilitated the purchase of the 12720 Burbank Boulevard condo.

18. I believe that ABELYAN used the forged letter and P/L statement to qualify for the loan without disclosing his real sources of income, and that the forged bank statements helped corroborate those false statements by making it appear that he was operating an ordinary consulting business.

19. I have reviewed "borrower's certification and authorization" forms from ABELYAN's United Wholesale Mortgage loan file, including a signed version from August 5, 2021, and an unsigned copy from August 16, 2021. On the form, he certified that he "made no misrepresentations in the loan application or other documents, nor did [he] omit any pertinent information." He also certified that "it is a Federal crime . . . to knowingly make any false statements when applying for a mortgage."

### D. ABELYAN Attempts to Flee the United States

20. I first approached ABELYAN in connection with this investigation on or about March 9, 2023. He subsequently retained attorney George Mgdesyan, who currently represents ABELYAN. I have reviewed an email, dated May 15, 2023, at 3:47 pm, and sent to the Assistant United States Attorney on this matter from Anahit Keshishyan, an employee at Mr. Mgdesyan's firm. The email stated, "I want to follow up regarding the Cargo Fleet Rentals matter . . . . What is the next step and what should we be expecting?" On May 16, I was on a phone call with Mr. Mgdesyan and the Assistant United States Attorney. The latter informed Mr. Mgdesyan that ABELYAN is an investigative target in connection with his defrauding the EIDL program, perpetrating mortgage fraud, and committing aggravated identity theft in connection with the mortgage fraud. The Assistant United States Attorney invited Mr. Mgdesyan to have ABELYAN participate in a voluntary interview with the government; Mr. Mgdesyan stated that he would speak with his client and get back to the government.

21. FBI Special Agent Justin Smet, who is assigned to LAX, informed me that ABELYAN booked tickets to depart LAX on an international flight to Armenia by way of Doha, Qatar, on Thursday, May 18, at 3 pm. He also booked a return flight to Los Angeles for June 10, 2023.

    a. In my training and experience, I know that it is not uncommon for those seeking to flee the United States to book return travel itinerary even when they have no intention of returning to the United States. Doing so is often employed as a lulling tactic intended to decrease the likelihood law enforcement will view the travel as suspicious and provide a build-in excuse after the fact if the defendant is arrested before departing.

  22. In this case, I believe ABELYAN's intended trip is likely an effort to flee the United States. ABELYAN attempted to take an international flight to Armenia just two days after the government notified his attorney that he is a target of a federal criminal investigation. As a citizen of Armenia and noncitizen of the United States, ABELYAN is likely facing automatic deportation as an aggravated felon if convicted in this case, so he has no incentive to wait through eventual criminal charges and a prison sentence instead of returning to Armenia on his own terms and avoiding prosecution altogether. Additionally, Armenia has no extradition treaty with the United States, and Article 55(2) of its constitution provides, "A citizen of the Republic of Armenia may not be extradited to a foreign state, except for cases prescribed by the international treaties ratified by the Republic of Armenia."[2] Thus, if ABELYAN had successfully made his way to Armenia, the prospects of ever subsequently apprehending him would have been bleak.

  23. On May 18, 2023, I and other agents arrested ABELYAN at LAX after being directed for a secondary search in going through security. ABELYAN was traveling alone, and we needed to transport him to the Los Angeles Metropolitan Detention Center, so we took custody of the property on his person and the personal bags he had with him (i.e., the Subject Property) and performed a preliminary inventory search. The Subject Property comprises approximately $27,885 in cash, various debit and credit cards, gold-colored coins, a Rolex watch, assorted jewelry, two iPhones, a Samsung Galaxy, an iPad, ABELYAN's driver's license,

---

[2] *See* http://www.parliament.am/parliament.php?id=constitution&lang=eng.

his permanent resident card, his Armenian passport, his (business class) boarding passes, clothing, and miscellaneous personal effects.

### E. Training and Experience in Investigating Fraud Offenses

24. Based on my training and experience, and information from other experienced investigators of fraud offenses, I also know the following:

  a. Typically, individuals involved in fraud schemes maintain evidence where it is close at hand and safe, such as on their persons or digital devices, or in their residences or vehicles. I know that individuals who commit crimes with the aid of electronic devices do not readily discard them, as computers, tablets, and cell phones are expensive items that are typically used for years before being upgraded or discarded. Digital devices can be used to communicate between co-conspirators and may contain information relating to the crime under investigation. And, even when those who use digital devices to commit fraud do upgrade them, they often transfer data across devices, such as contact lists, email and text communications, and documentary records.

  b. Individuals involved in fraud frequently keep the most damaging evidence and/or proceeds of the scheme close at hand to help conceal the fraud from third parties, such as associates who may have access to such documents at a workplace.

  c. More sophisticated or cagey criminals may rent public storage units, safe deposit boxes, or other third-party space to further distance themselves from incriminating evidence or to hide their illicit profits from law enforcement or civil litigants.

  d. The requested search warrant seeks not only to seize evidence of crimes but also the "fruits of crime" and "property designed for use, intended for use, or used in committing a crime." Fed. R. Crim. P. 41(c). Even long after a crime has been completed, the illicit proceeds of a crime often still exist, frequently secreted in forms or locations difficult to detect by law enforcement. For that reason, there is probable cause to seize evidence pertaining to ABELYAN's current assets and whether they were obtained using funds derived from fraud

## V. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

25. As used herein, the term "digital device" includes the SUBJECT DEVICES.

26. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

    c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

    d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

  27. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

    b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

    c. The review in this case may also take longer, since the Subject Property includes more than one digital device (specifically, three mobile phones and a tablet).

  3. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To

unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

    b.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

    c.  The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress ABELYAN's thumb and/or fingers on the devices; and (2) hold the devices in front of ABELYAN's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

    d.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

## VI. CONCLUSION

28. For all the reasons described above, there is probable cause to believe that evidence of violations of the Subject Offenses, as described above and in Attachment B of this affidavit, will be found in a search of the Subject Property, as further described above and in Attachment A of this affidavit, and that ABELYAN has committed wire fraud, in violation of 18 U.S.C. § 1343.

/s/
JUSTIN PALMERTON, Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
this 19th day of May, 2023.

THE HONORABLE STEVE KIM
UNITED STATES MAGISTRATE JUDGE